**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINTON )
1331 F Street, NW, Suite 900 )
Washington, DC 20004 )
 )
                        Plaintiff,       )
 )
v.                                       )
 )        Civil No.  1:21-cv-02482-DLF
U.S. DEPARTMENT OF THE ARMY )
104 Army Pentagon )
Washington, DC 20310-0104, and )
 )
SOUTH DAKOTA NATIONAL GUARD )
2823 West Main Street )
Rapid City, SD 57702 )
 )
 )
                        Defendants.      )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Established in 1636, the Army National Guard is the oldest component of the U.S. Armed

Forces and serves as the primary combat reserve of the U.S. Army.  _See_ https://www.national

guard.mil/About-the-Guard/Army-National-Guard/.  It functions as "an integral part of the first

line of defenses of the United States."  32 U.S. § 102.  Yet the individual units of the Army

National Guard are also State-run military agencies.  The Court of Appeals has recognized that

State National Guard units serve in a dual role, "operating under joint federal and state

command."  _In re: Sealed Case_, 551 F.3d 1047, 1048 (D.C. Cir. 2009).

This Freedom of Information Act ("FOIA") action concerns Plaintiff's request for records of one such unit: the South Dakota Army National Guard. In particular, Plaintiff's request sought several categories of records concerning a deployment of the South Dakota Army National Guard to the Texas border that was funded in part by a private donor. The National Guard Bureau processed Plaintiff's request, along with a related request by Plaintiff dated September 14, 2021, and Defendants released in part over two thousand pages of responsive records. Following the parties' extensive conferral, only one narrow area of dispute remains: whether FOIA Exemption 5 shields three categories of communications involving South Dakota State officials and the Adjutant General, the Commanding General of the South Dakota Air and Army National Guard. The Adjutant General, Major General Jeffrey P. Marlette, has submitted a declaration in support of the instant motion discussing the predecisional and deliberative nature of all three categories, as well as the harm that would result to South Dakota Army National Guard deliberative processes if the information at issue were not protected from disclosure. *See* Gen. Marlette Decl., ¶¶ 8–19.

Defendants understand that, in addition to challenging the application of the deliberative process privilege, Plaintiff intends to argue that the records at issue do not fulfill Exemption 5's threshold requirement that records must be "inter-agency" or "intra-agency" memoranda. As to the latter category, Plaintiff is mistaken. The dual Federal and State nature of the South Dakota Army National Guard renders consultations with State officials reflected in these records a necessary part of the Adjutant General's work. Their joint efforts are analogous to the communications between the Federal Reserve Board and regional, non-governmental Federal Reserve Banks; the D.C. Circuit has recognized that the Federal Reserve Board's deliberative, predecisional communications with such regional entities in the service of a common objective

brought their communications within the protection of Exemption 5 under the consultant corollary, *see McKinley v. Bd. of Governors of the Federal Reserve Sys.*, 647 F.3d 331, 335–36 (D.C. Cir. 2011), and the Court should likewise find that the consultant corollary applies in this case.

For all the reasons explained herein and in the supporting declarations of General Marlette and Chief of the Office of Information and Privacy & Civil Liberties in the Directorate of Management and Administration, National Guard Bureau Angela Wiggins, this Court should grant Defendants' motion for summary judgment and enter judgment for Defendants.

## II.    BACKGROUND

### A.  The National Guard

The Court of Appeals has explained that the organization of the National Guard "stems from Article I, Section 8 of the U.S. Constitution, which gives Congress authority '[t]o provide for organizing, arming, and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress.'" *In re Sealed Case*, 551 F.3d 1047, 1048 (D.C. Cir. 2009) (quoting U.S. CONST. art. I, § 8). "The Federal Government provides virtually all of the funding, the materiel, and the leadership for the State Guard units." *Perpich v. Dep't of Def.,* 496 U.S. 334, 351 (1990); *In re Sealed Case*, 551 F.3d at 1048 (quoting same). "Together, all federally recognized state units comprise one of the reserve components of the Army, known as the Army National Guard of the United States." *In re Sealed Case*, 551 F.3d at 1048 (quoting 10 U.S.C. § 10105). In sum, "[t]he National Guard . . . plays a dual role, operating under joint federal and state control." *Id.*

Accordingly, the Adjutant General, a State cabinet-level official who leads the South Dakota Army National Guard, likewise serves in a dual role. *See Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 993 (D.C. Cir. 2010) ("[W]hen not called to federal duty by the President, . . . a state National Guard is under the command of the state Governor and the State Adjutant General, who is appointed by the Governor."). The Adjutant General is appointed by the Governor, but must "be a *federally* recognized commissioned officer of the South Dakota National Guard, . . . and receive federal recognition as a general officer . . . including any waivers that may be authorized and granted or delegated by the secretaries of the Army or Air Force, as appropriate." S.D. Codified Laws § 33-1-2 (emphasis added). Numerous courts have thus recognized the fact that "an adjutant general is a state officer does not preclude his simultaneously being a federal agency." *NeSmith v. Fulton*, 615 F.2d 196, 199 (5th Cir. 1980); *see also e.g. Gilliam v. Miller*, 973 F.2d 760, 762 (9th Cir. 1992); *Chaudoin v. Atkinson*, 494 F.2d 1323, 1329 (3d Cir. 1974); *Lipscomb v. Federal Labor Relations Authority*, 200 F. Supp. 2d 650, 661 (S.D. Miss. 2001) (noting that courts have "recognized time and again that adjutants general are hybrid federal and state officials") (quotation omitted).

## B. Procedural Background

Plaintiff submitted its FOIA request on July 6, 2021, seeking:

1. All records relating to the "private donation" to support the deployment, including records sufficient to identify the amount of the private donation and any associated communications,

2. All records reflecting any complaint, inquiry, analysis, consideration, or determination by the Department of Defense (DoD), the National Guard, or any other federal or state entity regarding the propriety of using a private donation to fund the deployment,

3. All records reflecting any complaint, inquiry, analysis, consideration, or determination by the DoD, the National Guard, or any other federal or state entity regarding any legal restrictions applicable to the deployment,

4. All communications with Governor Noem's office regarding the deployment, and

5. All records reflecting the parameters of the deployment, including any instructions or other communications to SDNG members about the nature of the deployment, whether participation is mandatory or voluntary, and the source of funding for the deployment.

*See* Wiggins Decl., ¶ 5 (quoting Plaintiff's request). On August 26, 2021, the South Dakota National Guard denied Plaintiff's request stating that, with regard to the deployment of South Dakota National Guard Soldiers to Texas, it was not a Federal agency subject to FOIA. *See id.*, ¶ 6. That denial letter also stated that, if the FOIA request were proper, then any responsive records would be exempt under 5 U.S.C. § 552(b)(5) as part of the deliberative process of the agency. *See* Wiggins Decl., ¶ 6.

Plaintiff filed its complaint on September 22, 2021, and the National Guard Bureau thereafter searched for records responsive to Plaintiff's July 6, 2021, request, as well as responsive to a related request by Plaintiff dated September 14, 2021. *See id.* ¶ 8. Defendants ultimately produced on a rolling basis, in full or in part, over two thousand pages. *Id.* The parties conferred extensively about the Defendants' withholdings and narrowed the remaining issues in dispute to three categories of withholdings under Exemption 5, from Defendants' September 14, 2022 release:

1. Communications between the Adjutant General and State officials, in connection with preparing statements to the press regarding the South Dakota Army National Guard Unit's deployment, and communications regarding the process for responding to press inquiries;

2. A communication with the Adjutant General in which a subordinate State official consults him concerning questions from a United States Senator's office regarding that deployment; and,

3. Discussions among State officials, and bringing in the Adjutant General, in response to inquiries regarding issues related to the proper procedure for

accepting a private donation by the State of South Dakota, proper routing of
such inquiries and which office(s) would be responsible for follow up.

Decl. of Gen. Marlette, ¶ 4; Wiggins Decl., ¶ 11.  Below, Defendants explain why Exemption 5

protects each of these categories from disclosure.

## III.    ARGUMENT

Defendants have properly withheld the three categories of information at issue in this

case pursuant to FOIA Exemption 5 because all three categories appear in intra-agency

memoranda and are protected by the deliberative process privilege.  Section B below explains

why that is so, while Section A, as a preliminary matter, describes the statutory background and

standard of review applicable in this type of FOIA case.  Section C, in conclusion, explains why

Defendants have complied with the FOIA Improvement Act's requirements that they segregate

and disclose non-privileged information, and demonstrate that foreseeable harm would result

from disclosure of the withheld material.

### A.  FOIA Statutory Background and Standard of Review

The Freedom of Information Act was enacted to "pierce the veil of administrative secrecy

and to open agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S.

352, 361 (1976) (citation omitted).  "Congress recognized," however, "that public disclosure is

not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), "and has therefore

provided the nine exemptions listed in 5 U.S.C. § 552(b)."  *Am. Civil Liberties Union v. U.S.

Dep't of Def.*, 628 F.3d 612, 618 (D.C. Cir. 2011).  An agency may withhold information under a

FOIA exemption only if it "reasonably foresees that disclosure would harm an interest protected

by an exemption" or if "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i).  Despite

the "liberal congressional purpose" of FOIA, the Supreme Court has recognized that these

statutory exemptions are intended to have "meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

"FOIA cases are generally resolved at summary judgment," *Pub. Employees for Envtl. Responsibility v. U.S. Envtl. Prot. Agency*, 211 F. Supp. 3d 227, 230 (D.D.C. 2016) ("*PEER*"), "which is appropriately granted when the movant has established that 'there is no genuine dispute as to any material fact,' warranting 'judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "In deciding a motion for summary judgment, the Court assumes the truth of the non-movant's evidence and draws all reasonable inferences in the non-movant's favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"In a FOIA case, 'the burden is on the agency to demonstrate . . . that the materials sought . . . have not been improperly withheld.'" *DOJ v. Tax Analysts*, 492 U.S. 136 (1989)); *see also*, *e.g.*, *Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018). Typically, an agency demonstrates the applicability of a FOIA exemption by submitting affidavits or declarations in support of its summary judgment motion. *Shapiro*, 893 F.3d at 799 (citing *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Id.* (citing *ACLU*, 628 F.3d at 619). Such affidavits are "accorded 'a presumption of good faith.'" *WP Co. LLC v. U.S. Small Bus. Admin.*, 575 F. Supp. 3d 114, 117–18 (D.D.C. 2021) (quoting *SafeCard Services., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). Generally, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Shapiro*, 893 F.3d at 799 (quoting *Larson v. Dep't of State*, 565

F.3d 857, 862 (D.C. Cir. 2009)).  Additionally, an agency may withhold information under a

FOIA exemption only if it "reasonably foresees that disclosure would harm an interest protected

by an exemption" or if "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i).

In the instant case, as discussed in Section B below, the declarations of Ms. Wiggins and

General Marlette submitted herewith meet the Defendants' burden by explaining, with

reasonably specific detail, why the information at issue is properly shielded from disclosure

under Exemption 5, and why its disclosure would harm an interest protected by Exemption 5.

**B.  FOIA Exemption 5**

Exemption 5 shields from mandatory disclosure "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency."  5 U.S.C. § 552(b)(5).  To qualify for protection under this

exemption, a record must fulfill two conditions:  1) it must be an inter-agency or intra-agency

memorandum, and 2) it must fall within the ambit of a privilege that would protect it from

disclosure in litigation against the agency that holds the record.  *See*, *e.g.*, *McKinley v. Bd. of*

*Governors of the Federal Reserve Sys.*, 647 F.3d 331, 335–36 (D.C. Cir. 2011).  The records at

issue here satisfy both.

**1.  The Records at Issue Are Intra-Agency Memoranda.**

The three categories of records at issue here all involve communications between the

Adjutant General and South Dakota State officials, and are intra-agency memoranda eligible for

protection under Exemption 5.[1]

---

[1] These records are not interagency memoranda because, as this Court recently noted, "a state agency is not an agency for purposes of FOIA."  *Nat'l Wildlife Fed.*, 596 F. Supp. 3d 130, 139–40 (D.D.C. 2022) (quotation omitted).

It is "well established" that "a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency'" for purposes of Exemption 5's threshold requirement that it be "inter-agency or intra-agency." *Nat'l Inst. of Military Justice v. DOD* [*NIMJ*], 512 F.3d 677, 684 (D.C. Cir. 2008). Rather, "the language of Exemption 5 clearly embraces" certain situations in which an agency consults with entities that "are not agencies within the meaning of the FOIA." *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980). Such an application of Exemption 5 is referred to as the consultant corollary. In *Klamath*, the Supreme Court acknowledged—and expressly declined to overrule—the consultant corollary line of cases. *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001) (acknowledging that, in some settings, "consultants may be enough like the agency's own personnel to justify calling their communications 'intra-agency.'"). And, since *Klamath*, the D.C. Circuit has continued to rely on the consultant corollary in holding that intra-agency records may include communications with outside parties. *See*, *e.g.*, *McKinley*, 647 F.3d at 335–36; *see also Judicial Watch, Inc. v. U.S. Dep't of Transportation*, 950 F. Supp. 2d 213, 217–18 (D.D.C. 2013).

The D.C. Circuit "has allowed any communication that aids the agency's deliberative process to be protected as 'inter-agency.'" *Judicial Watch, Inc.*, 950 F. Supp. 2d at 218. The Supreme Court in *Klamath* "modifie[d] this by requiring that [the courts] not protect communications with interested parties seeking a government benefit that is adverse to others seeking that benefit." *Id.* Although some cases discuss that the outside communications must be "solicited by" an agency, *see*, *e.g.*, *Nat'l Wildlife Federation v. U.S. Army Corps of Engineers*, 596 F. Supp. 3d 130, 140, the D.C. Circuit has not applied that as a dispositive requirement. *See CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1161–62 (D.C. Cir. 1987) *and Formaldehyde Institute v. Dep't of Health and Human Services*, 889 F.2d 1118, 1122 (D.C. Cir. 1989); *see also*

*Judicial Watch, Inc.*, 950 F. Supp. 2d at 218 n.3 (rejecting the plaintiff's argument that the D.C. Circuit limited "intra-agency communications" to those solicited by an agency). In sum, "[w]hen communications between an agency and a non-agency aid the agency's decision-making process and the non-agency did not have an outside interest in obtaining a benefit that is at the expense of competitors, the communication must be considered an intra-agency communication for the purposes of FOIA Exemption 5." *Id.* at 218–19.

Particularly instructive here are those cases in which the courts, including the D.C. Circuit, have held that communications between Federal agencies and individual Federal Reserve Banks—"private corporations whose stock is owned by the member commercial banks within their districts," *McKinley*, 647 F.3d at 333—qualified as "intra-agency" memoranda under Exemption 5. The Federal Reserve System, which "Congress created . . . to serve as the nation's central bank," "is not a single entity but rather a composite of several parts, both public and private, organized on a regional basis with a central governmental supervisory authority." *Id.* at 332 (quotation omitted). Each of the regional Reserve Banks has significant authority "to perform . . . acts consistent with a private corporation," but the Board "exercises significant supervisory authority over the Reserve Banks." *Id.* at 333. And, while the regional Reserve Banks have their own "independent statutory dut[ies]," *id.* at 337, the Board and the Reserve Banks share a common goal, namely 'the maintenance of a sound and orderly financial system.'" *Id.* (quoting 12 C.F.R. § 201.1(b)). *See also Greenspan v. Bd. of Governors of the Federal Reserve Sys.*, 2022 WL 17356879, at *7 (D.D.C. Dec. 1, 2022) (holding that communications between the Federal Reserve Board and staff members of Federal Reserve Banks were subject to protection under the consultant corollary); *cf. Fox News Network, LLC v. U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 540 (S.D.N.Y. Sept. 2010) (holding that Federal Reserve Bank of

New York, a non-federal entity, and Treasury "were on the same team" and that therefore any documents passed between them qualified as intra-agency communications).

The Federal Reserve line of cases provides important guidance here because the National Guard likewise is not a single entity, but is comprised of numerous state National Guard units which comply with federal criteria and which, together, "comprise one of the reserve components of the Army, known as the Army National Guard of the United States." *In re Sealed Case*, 551 F.3d at 1048. And, just as the D.C. Circuit in *McKinley* declined to artificially separate the statutory duties of the Federal Reserve Banks from the responsibilities of the Board, *see McKinley*, 647 F.3d at 337, because "[s]tatutes, regulations and case law make clear . . .that the Board and the Reserve Banks share a common goal," likewise the National Guard units function as "an integral part of the first line defenses of the United States." *Id.* at 1047.

The Declaration of General Marlette describes the dual nature of his role as Adjutant General, working with both Federal and State officials in his leadership of the South Dakota Army National Guard. *See also supra* at 4. As he explains, in the course of his deliberations with respect to matters as diverse as statements to the press, communications with members of Congress, and the internal procedures that should be followed concerning a private donation, his decisionmaking is informed by both Federal and State rules, regulations, and policies. Decl. of Gen. Marlette, ¶¶ 3, 7. This is the by-product of the dual nature of the South Dakota National Guard. And just as the reality of the Federal Reserve's structure made it unreasonable to separate out the functions of the individual Federal Reserve Banks from that of the Board, so too in this case. The records at issue here comprise communications between the Adjutant General, an official serving in a dual role, and State Officials, in connection with preparing statements to the press regarding the South Dakota Army National Guard Unit's deployment; answering

questions from a United States Senator's office regarding that deployment; and discussions in response to inquiries regarding issues related to the proper procedure for accepting a private donation by the State of South Dakota, proper routing of such inquiries and which office(s) would be responsible for follow up.  Decl. of Gen. Marlette, ¶ 4; Wiggins Decl., ¶ 11.  The Adjutant General's deliberations concerning each of these categories implicates the inextricably linked Federal and State responsibilities of overseeing the South Dakota Army National Guard, including his stewardship over Federal assets.[2]  The Federal nature of the Adjutant General's work is apparent in the second and third categories:  the second involves inquiries from a United States Senator's office regarding the funding for the deployment, and the third involves questions pertaining to National Guard units, broadly, rather than a policy specific to the South Dakota Army National Guard.  But even where it is not as immediately apparent—with respect to statements to the press concerning the South Dakota Army National Guard—the Adjutant General must include in his analysis considerations of Federal policy and the applicable Federal rules and regulations.  *See supra*.  In this setting, the records at issue are appropriately treated as intra-agency records, even if—in light of the National Guard's dual role—they include communications with State officials as well.

Where the courts have declined to protect communications under the consultant corollary, they have faced situations importantly different from that presented here.  For example, in *National Wildlife Federation*, where this Court held that communications between the U.S.

---

[2] Most of the funding for the South Dakota National Guard is Federal, *see* Decl. of Gen. Marlette, ¶ 3, but Federal law requires that the State reimburse the unit for any assets used in a State Active Duty mission such as the deployment to Texas that was the subject of Plaintiff's requests here.  *See* Dep't of Defense, Financial Management Regulation, Vol. 11A: "Reimbursable Operations Policy," DoD 7000.14 - R; National Guard Regulation 500-5/ Air National Guard Instruction 10-208, National Guard Domestic Law Enforcement Support and Mission Assurance Operations, paragraph 5-5.

Army Corps of Engineers ("the Corps') and a political subdivision of the State of Mississippi were not protected under the consultant corollary, the Court found that the doctrine would have to be applied "in reverse" in that case, because the political subdivision had hired the Corps as *its* consultant. *See Nat'l Wildlife Fed.*, 596 F. Supp. 3d at 140–41. Thus, it was not the Federal agency's deliberative process that was being aided by the consultation, but the outside party's. *See id.* This concern is inapplicable here, because—as in the cases concerning the Federal Reserve System—the dual Federal and State nature of the National Guard means that the deliberations of Federal and State officials concerning its work serve common Federal and State purposes.[3]

For all these reasons, the records at issue constitute intra-agency memoranda properly protected under Exemption 5.

## 2. The Records at Issue are Protected by Deliberative Process Privilege.

To qualify for protection under Exemption 5, in addition to being an inter- or intra-agency record, a record also "must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. Here, the applicable privilege is that which protects the agency's deliberative process. As the Supreme Court explained: "[t]he deliberative process privilege rests on the obvious

---

[3] Likewise, the recent decision in *Georgia v. DOJ*, 2023 WL 2116375 (D.D.C. Feb. 20, 2023) is distinguishable from the instant case as it concerned the collaboration of Department of Justice (DOJ) attorneys with private parties concerning lawsuits challenging a Georgia law. The Court held that the consultant corollary did not protect communications among the different parties' attorneys with DOJ attorneys, reasoning that consultants, to qualify under this doctrine, must "function[] just as an employee [of the agency] would be expected to do." *Georgia*, 2023 WL 2116375, at *4 (quoting *Klamath*, 532 U.S. at 11). Although Defendants respectfully disagree with certain facets of the Court's analysis in that case, the circumstances there— concerning communications of attorneys representing private parties in litigation—plainly differ from the Federal-State communications here addressing the South Dakota National Guard, an entity which indisputably serves in a dual State and Federal role. *See supra* at 3–4.

realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency discussions." *Id.* at 8–9 (quotation omitted); *see also*, *e.g.*, *Formaldehyde*, 889 F.2d at 1125 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . *to the detriment of the decisionmaking process*.") (ellipsis and emphasis in original) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975)).

"To qualify for Exemption 5 protection under the deliberative process privilege, 'an agency's materials must be both 'predecisional' and a part of the 'deliberative process.''" *McKinley*, 647 F.3d at 339 (quoting *NIMJ*, 512 F.3d at 680 n.4). "A *predecisional* document is one prepared in order to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) (quotations omitted) (emphasis in original). An agency need not identify a specific final agency decision, but must establish "what deliberative process is involved, and the role played by the documents at issue in the course of that process." *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 868 (D.C. Cir. 1980).

Predecisional materials are "deliberative" if they "reflect[ ] the give-and-take of the consultative process," either by "assessing the merits of a particular viewpoint, or by articulating the process used by the agency to formulate a decision." *Id.* at 867. Materials need not include recommendations or express opinions to be considered "deliberative." Rather, Exemption 5 also covers "communications which, if revealed, would expose to public view the deliberative

14

process of an agency." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir.1982); *see also Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977). To meet its burden, "the government typically must show 'the roles of the document drafters and recipients,' the 'nature of the withheld content,' and the 'stage within the broader deliberative process in which the withheld material operates.'" Campaign Legal Ctr. v. United States Dep't of Just., 34 F.4th 14, 23 (D.C. Cir. 2022) (quoting *Judicial Watch, Inc. v. DOJ*, 20 F.4th 49, 56 (D.C. Cir. 2021)). Finally, the government must explain "the way in which the withheld material facilitated agency deliberation." *Id.* (quoting *Judicial Watch, Inc.*, 20 F.4th at 56).

Here, all three categories of records are both predecisional and deliberative.

**a) Discussions Concerning Draft Public Statements and Process for Responding to Press Inquiries**

The majority of the documents at issue here fall within this first category, and concern the preparation of a press release and a script for a video statement, through which the Governor would be providing information to the public about the deployment of the South Dakota Army National Guard. *See* Wiggins Decl., ¶ 11. As other Judges of this Court have observed: "the overwhelming consensus among judges in this District is that the privilege protects agency deliberations about public statements, including the use of talking points." *Am. Ctr. for Law & Justice v. DOJ*, 334 F. Supp. 3d 13, 21 (D.D.C. 2018) (quoting *Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 171– 72 (D.D.C. Sept. 7, 2018).); *see also Am. Ctr. for Law & Justice*, 334 F. Supp. 3d at 21 ("courts have generally found that documents created in anticipation of press inquiries are protected") (quoting *Protect Democracy Project, Inc. v. U.S. Dep't of Defense*, 320 F.Supp.3d 162, 177 (D.D.C. 2018)).

The communications in this category comprise discussion about the intended plan for responding to press inquiries, and the content of anticipated statements to the press and the public. *See* Decl. of Gen. Marlette, ¶ 8. With respect to the communication concerning an intended plan for responding to press inquiries, such material is predecisional because it preceded the anticipated press inquiries, and the final product of the deliberations concerning how to respond to such inquiries also would have been disclosed in the responses to any inquiries that came in. *See id.* ¶¶ 8, 9. As to the latter set: the discussion is among General Marlette and State officials concerning a proposed written or video statement by the Governor, and the Governor is the final decisionmaker concerning the content of her statements. *See id.* ¶ 8. Such materials are also plainly predecisional, as their purpose is to develop or finalize the content of those statements. And, although an agency need not identify a final decision to which "predecisional" records relate, *see supra*, here, final versions of the press release and the video statement under discussion were released to the public. *See id.*, ¶ 9. Such records are also deliberative because they reflect questions about or input into the proposed content of those statements. *See id.* ¶ 8. Such communications reflect the joint deliberations of General Marlette and State officials concerning the contents to recommend to the Governor. *See id.*

As General Marlette explains in his declaration, disclosure of the details of the give and take of developing these statements would impede candid discussions regarding the content of the statements, thereby diminishing the quality of the information reported out to the public. *See id.*, ¶ 10. Moreover, because of the small population in South Dakota's State capital, the community where these officials live and work, the effect of publicly disclosing the deliberative contents of officials' conversations would be exacerbated. *See id.* ¶ 18. This is the very harm that Congress intended to prevent by exempting information protected by the deliberative process privilege from

disclosure under FOIA.  *See Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 300 (D.D.C. 1999) ("Exemption 5, and the deliberative process privilege, reflect the legislative judgment that 'the quality of administrative decisionmaking would be seriously undermined if agencies were forced to operate in a fish-bowl because the full and frank exchange of ideas on legal or policy matters would be impossible.'") (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C.Cir.1997)).

**b)  Discussion Concerning Response to Inquiry from Senator's Office**

Similar analysis applies to the second category of information, comprising an inquiry to General Marlette from a subordinate official concerning a response to an inquiry received from a United States Senator's office.  *See* Decl. of Gen. Marlette, ¶ 11.  That inquiry focused on the funding for the South Dakota Army National Guard deployment and included questions about reimbursement and authority of the State of South Dakota to receive funding from a donation. *See id.*  The material withheld comprises a consultation with the General, seeking guidance regarding the response.  *See id.*

Such material is predecisional as it preceded the determination of how to respond to the inquiry from the Senator's office, and it is deliberative because it initiates the give and take of determining how to appropriately respond to the inquiry.  For the same reasons based on which deliberations about anticipated statements to the public or the press are routinely protected from disclosure, deliberations about anticipated statements in response to an inquiry from a Senator's office should be protected.  *See*, *e.g.*, *Protect Democracy Project, Inc. v. DOD*, 320 F. Supp. 3d 162, 177 (D.D.C. 2018) (holding that talking points to respond to inquiries from the press and Congress were protected from disclosure because "revealing their contents would expose the process by which agency officials crafted a strategy for responding").

That the consultation at issue comprises an inquiry is of no moment; as General Marlette explains, the knowledge that the content of inquiries submitted to him might be publicly disclosed would likely cause self-censorship among subordinates, as they would consider, in the context of the small community of Pierre, South Dakota, how questions might be taken out of context or misconstrued by friends or neighbors. *See* Decl. of Gen. Marlette, ¶ 13. Hampering internal discussions in that way would, in turn, harm the internal discussions ultimately informing General Marlette's deliberations and result in the harm that Congress intended to avoid by shielding deliberative communications from disclosure. *See supra* ¶ 14.

### c) Discussion in Response to Inquiries Regarding Issues Related to the Proper Procedure for Accepting a Private Donation and How to Address Related Inquiries

Finally, the third category of records at issue comprises a collaborative effort among State officials, and bringing in General Marlette, discussing inquiries related to a private donation to the State and the proper procedure for accepting that private donation; proper routing of such inquiries; and which office(s) will be responsible for follow up. *See* Decl. of General Marlette, ¶ 15. These discussions are predecisional because they occur prior to final determinations on the substantive issues raised, and they are deliberative because they contain the opinions of the officials engaged in the discussions and reveal the process by which some of them propose the matters raised should be addressed.

As General Marlette explains in his declaration, his participation in such deliberations is critical to his oversight role. *See id.*, ¶ 17. General Marlette's oversight necessarily includes, *inter alia,* use of the South Dakota Army National Guard on State Active Duty missions and reimbursement by the State for State Active Duty costs, and ensuring compliance with the applicable federal laws, regulations, and procedures. *See id.* If State officials thought that their deliberative discussions concerning these important issues would be subject to public disclosure

if they included General Marlette, he predicts they would likely stop including him in such communications, limiting his ability to conduct oversight and make informed decisions concerning units under his purview. *See id.* In other words, the result of such a disclosure would be harm not only to the deliberative process of determining how to respond to issues raised in the inquiries about the State Active Duty mission at issue here, but also more broadly impede General Marlette's ability to render timely and informed decisions in his oversight of the South Dakota Army National Guard. *See id.*

### C. Defendants Have Complied with the FOIA Improvement Act's Requirements that they Segregate and Disclose non-Privileged Information, and Demonstrate that Foreseeable Harm Would Result from Disclosure of the Withheld Material.

#### 1. Defendants Released All Reasonably Segregable Non-Exempt Responsive Material.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc.*, 566 F.2d at 260. But this provision does not require disclosure of records in which the non-exempt information that remains is meaningless. *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 221 (D.D.C. 2005). And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Consistent with this obligation, Defendants have conducted a thorough review of the materials at issue and concluded that there is no additional, non-exempt information that may reasonably be segregated and released without undermining the full and frank discussion that Exemption 5 is intended to protect. *See* Wiggins Decl. ¶ 13. This conclusion is borne out by the

released records: redactions have been taken only where specific information protected by exemptions is at issue, and the only pages on which all material is redacted are those comprising draft documents. *See id.* Therefore, because Ms. Wiggins's declaration establishes that all reasonably segregable, non-exempt information has been released, summary judgment should be granted for Defendants. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) ("Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material.").

### 2. Defendants Demonstrated That They Would Suffer Foreseeable Harm if Ordered to Disclose Any of the Withheld Materials.

An agency may only invoke a FOIA exemption if it "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). Though an agency may not rely on "mere speculative or abstract fears," *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 105 (D.D.C. 2019) (quotation marks omitted) (quoting S. Rep. No. 114-4, at 8 (2015)), "fear of embarrassment," *id.*, or "generalized assertions," *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020), to justify its withholdings, neither must an agency satisfy the foreseeable harm requirement on "a document-by-document basis," *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021). Instead, an agency "may take a categorical approach—that is, group together like records—. . . [and] explain the foreseeable harm of disclosure for each category." *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reporters Comm.*, 3 F.4th 369–70 (quoting *Machado Amadis*, 971 F.3d at 371).

As to all three categories discussed herein, Defendants have met this standard, and concretely explained, category by category, how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reporters Comm.*, 3 F.4th 369–70 (quoting *Machado Amadis*, 971 F.3d at 372.  As to the category of documents concerning the development of statements to the press, General Marlette explains in his declaration that disclosure of the details of the give and take of developing statements would impede candid discussions regarding the content of the drafts, thereby diminishing the quality of the information reported out to the public.  *See* Decl. of Gen. Marlette, ¶ 10.  As to the second category of information, a consultation by a subordinate officer concerning how to address an inquiry from a Senator's office: General Marlette explained that the expectation that questions directed to him might be publicly disclosed would likely cause self-censorship among subordinates, as they would consider how questions might be taken out of context or misconstrued by friends or neighbors.  *See* Decl. of Gen. Marlette, ¶ 14.  Hampering internal discussions in that way would, in turn, harm the internal discussions ultimately informing General Marlette's deliberations and, with respect to inquiries like this one, diminish the quality of information ultimately received by Congress in response to requests.  Finally, the third category of records comprises a collaborative effort among State officials, and bringing in General Marlette, discussing inquiries related to a private donation to the State and the proper procedure for accepting that private donation; proper routing of such inquiries; and which office(s) will be responsible for follow up.  *See* Decl. of General Marlette, ¶ 15.  As General Marlette explains, his participation in such deliberations is critical to his oversight role, as that role includes the budget and therefore the funding for the South Dakota Army National Guard, as well as ensuring compliance with the applicable federal laws, regulations, and procedures.  *See id.* ¶ 17.  If State officials thought that their deliberative discussions concerning these important

issues would be subject to public disclosure if they included General Marlette, he predicts they would likely stop including him in such communications, limiting his ability to conduct oversight and make informed decisions concerning the unit's funding and budget. *See id.* In other words, the result of such a disclosure would be harm not only to the deliberative process of determining how to respond to issues raised in the inquiries about the State Active Duty mission at issue here, but also more broadly impede General Marlette's ability to render timely and informed decisions in his oversight of the South Dakota Army National Guard. *See id.*

For two reasons, the harms discussed herein are not just possible, but likely. First, as discussed above, because of the small population in South Dakota's State capital—where the officials involved in these conversations live and work—the effect of publicly disclosing the deliberative contents of officials' conversations would be exacerbated. *See id.* ¶ 18. The potential for negative repercussions arising from a misunderstood question, or a remark taken out of context, is greater in this setting than it would be in a larger community. *See id.*

Additionally, deliberative discussions are protected from disclosure under South Dakota state law. *See* South Dakota Codified Law (SDCL), § 1-27-1.9 (entitled "Documents or communications used for decisional process arising from person's official duties not subject to compulsory disclosure"). Thus, if disclosure of the three categories of materials at issue in this case were ordered, a straightforward way for State officials to protect the confidentiality of their deliberative discussions and avoid the risk of confusion, misunderstanding, or embarrassment discussed above, would be to exclude General Marlette from the development of statements to the press or answers to Congressional inquiries about the National Guard unit that he leads, and not to include him in discussions regarding how to address, and who should address, questions that arise related to the funding of that unit. *See* Decl. of Gen. Marlette, ¶ 19. Under such

circumstances, the quality of the information supplied to the public and to Congress about the unit would suffer, as would the quality of decisions that arise from a decisionmaking process concerning unit funding that excludes the unit's Commanding Officer. *See id.* And, of course, General Marlette's own ability to make well-informed decisions as part of his oversight of that unit would suffer if State officials were to exclude him from the give and take surrounding these issues. *See id.*

This "focused and concrete" analysis, *Reporters Comm.*, 3 F.4th at 370—specific to the setting, information, and individuals concerned in this case—amply satisfies Defendants' burden on summary judgment. *See also Leopold v. DOJ*, 2021 WL 3128866, at *3–4 (D.D.C. July 23, 2021) (upholding similar categorical approach in the analysis of foreseeable harm with respect to withholdings under Exemption 5).

## IV.    CONCLUSION

For all of these reasons, the Court should grant Defendants' motion for summary judgment and enter judgment for Defendants.

Dated: February 28, 2023                          Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Principal Deputy Assistant Attorney General
                                                  Civil Division

                                                  ELIZABETH J. SHAPIRO
                                                  Deputy Director,
                                                  Federal Programs Branch

                                                  */s/ Julia A. Heiman*
                                                  Julia A. Heiman (D.C. Bar No. 986228)
                                                  Senior Counsel
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, N.W.

Washington, D.C. 20005
Tel: (202) 616-8480
Julia.Heiman@usdoj.gov
*Counsel for Defendants*