THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINTON 1331 F Street, NW, Suite 900 Washington, DC 20004 | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No.  1:21-cv-02482-DLF |
| U.S. DEPARTMENT OF THE ARMY 104 Army Pentagon Washington, DC 20310-0104, and | ) ) ) ) | |
| SOUTH DAKOTA NATIONAL GUARD 2823 West Main Street Rapid City, SD 57702 | ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

In their opening submission, Defendants explained that the communications in this case

are part of the work of the Adjutant General of the South Dakota National Guard, in his dual

State and Federal role.  *See* Defendants' Motion for Summary Judgment, ECF No. 23-1 ("Defs'

Mot.").  General Marlette, the Adjutant General, submitted a declaration discussing the ways in

which those communications implicated his Federal and State responsibilities, and detailing the

reasons why the deliberative processes he undertakes as a Federal official would be harmed by

disclosure of those communications.  *See* Decl. of Major General Marlette, ECF No. 23-3.  In

sum, as he explained, both because of the size of the community in Pierre, South Dakota, and

because of the protection for such communications afforded by South Dakota laws, General

Marlette anticipates that, if the records at issue were disclosed, State employees would likely

exclude him from their communications going forward including deliberations about

communications with the press and funding for State Active Duty missions.  As a result, his

ability to make informed decisions concerning the proper use of units under his charge and the

quality of information about those units provided to the public would suffer.

In Plaintiff's Memorandum in Support of its Cross-Motion for Summary Judgment and

Opposition to Defendants' Motion for Summary Judgement, ECF No. 24-1 (Pl.'s Mem.),

Plaintiff objects to the protection of those communications, and insists that the Government is

asking to apply the consultant corollary "in reverse" as the Court concluded in *Nat'l Wildlife*

*Fed'n v. U.S. Army Corps of Eng'rs*, 596 F. Supp. 3d 130, 141 (D.D.C. 2022).  *See* Pl.'s Mem. at

1, 7.  That case concerned a single project on which a municipal district had hired a federal

agency to advise.  *Nat'l Wildlife*, 596 F. Sump. 3d at 141.  Plaintiff asks this Court to conclude

that General Marlette's role was similar.  It was not.

General Marlette serves as the senior military officer and Commanding General for a

hybrid Federal and State agency.  The very structure of the National Guard necessitates General

Marlette's ongoing partnership with State officials to perform his Federal role.  Where Congress

has built communications with a non-agency into the fabric of an agency, the consultant

corollary doctrine treats the agency's communications with that non-agency as "intra-agency"

records.  *See*, *e.g.*, *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331 (D.C.

Cir. 2011); *Judicial Watch, Inc. v. U.S. Dep't of Transp.*, 950 F. Supp. 2d 213 (D.D.C. 2013).

Plaintiff urges the Court to divide the consultative process into purely State deliberations on

which General Marlette was brought in to advise, but this is an "artificial . . . segmentation of the

consultative process" that is not supported by the facts or the law. *Public Citizen, Inc. v. Dep't of Justice*, 111 F.3d 168, 172 (D.C. Cir. 1997). Indeed, "[m]ost centrally, [this] Circuit has highlighted that 'what matters is the nature of the relationship between the consultant and the agency, not the formalities observed.'" *Judicial Watch, Inc. v. U.S. Dep't of State*, 306 F. Supp. 3d 97, 107 (D.D.C. 2018) (quoting *Nat'l Inst. of Military Justice v. DOD* [*NIMJ*], 512 F.3d 677, 684 (D.C. Cir. 2008)). Here, the nature of the relationship between the State and the South Dakota National Guard amply justifies protecting the records at issue to prevent the harm to Federal decisionmaking that would likely result from disclosure.

For all the reasons explained herein and in Defendants' motion, the Court should grant Defendants' motion and deny Plaintiff's cross-motion.

## II.   ARGUMENT

Plaintiff raises three arguments in support of its position that the consultant corollary should not apply here, and that the deliberative process privilege should not protect these records. Plaintiff urges that: 1) the deliberative process at issue in these communications was the State's and not the agency's; 2) the agency did not solicit the communications at issue as required by the case law; and 3) the State was not a disinterested consultant as required by the case law.

All three objections miss the mark. The first reflects a misunderstanding of the facts, and the reality that there was a Federal decision-making process alongside the State's in these communications, while the latter two reflect a misapprehension of the doctrine. The consultant corollary is not so narrow as Plaintiff suggests. It requires neither a formal request by an agency at the outset of "intra-agency communications" nor an entirely disinterested non-agency. Instead, in a number of cases where neither was present, communications have been protected as

intra-agency records because of the consultant relationship between the participants, so long as

the non-agency was not competing with others to gain a government benefit.  There is, of course,

no such adverse interest here.

### A.  The Records at Issue Were Created to Aid Both Federal and State Decisionmaking.

Plaintiff begins its argument by asserting that "[t]here is no dispute that the withheld

records were created to aid the state government officials' decision-making."  Pl.'s Mem. at 6.

While that may be so, the Plaintiff's position rests on a false dichotomy, built on the mistaken

premise that there cannot be two decision-making processes, one State and one Federal, side by

side.

The case law addressing the consultant corollary recognizes that, as occurred in this case,

communications may be in aid of both an agency's and a non-agency's decision-making.[1]  *See,*

*e.g. Judicial Watch*, 306 F. Supp. 3d at 112 (recognizing that "it is not always readily apparent

whether a record was created for the purpose of aiding an agency's decisionmaking process or

for some other reason").  "Indeed, the D.C. Circuit has recognized that, under some

circumstances, a consultant and an agency may share common goals such that, even if the

consultant appears to be acting to foster its own interests, its actions might also be construed as

aiding an agency process."  *Id.* (citing *Formaldehyde Inst. v. Dep't of Health & Human Servs.*,

889 F.2d 1118, 1124–25 (D.C. Cir. 1989)).

---

[1] Plaintiff also questions the continued validity of the doctrine, Pl.'s Mem. at 6 n.3, but overlooks that since the Supreme Court declined to overrule the doctrine in *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001), the D.C. Circuit has "affirmed the validity of pre-*Klamath* Circuit precedents interpreting the consultant corollary," *Judicial Watch, Inc.*, 306 F. Supp. 3d at 107 (citing *NIMJ*, 512 F.3d at 684), and continued to apply it to protect sensitive communications from disclosure in a variety of settings as discussed herein.

In their opening submission, Defendants identified case law concerning the Federal Reserve system as analogous to the hybrid State and Federal National Guard system, demonstrating that two decisionmaking processes can proceed concurrently.  Plaintiff dismisses *McKinley*, the D.C. Circuit case concerning the Federal Reserve, as inapposite because in that case the agency, the Federal Reserve Board had sought information from the non-agency, the Federal Reserve Bank of New York (FRBNY), "to aid *the Board's* deliberative process."  Pl.'s Mem. at 7 (quotation omitted) (emphasis Plaintiff's).

Plaintiff overlooks that in that case, as here, both the agency and the non-agency had undertaken deliberative processes in connection with the information exchanged.  That case concerned a loan from the Federal Reserve system to Bear Stearns.  *McKinley*, 647 F.3d at 332–333.  Although the Federal Reserve Board was deliberating in that case whether to authorize the FRBNY to extend a loan to Bear Stearns, the FRBNY had its own independent decision to make as to whether to approve the loan in question.  *See id.*  Indeed, that non-agency decision appears to have been later in time than the agency decision:  "[t]he Board . . . authorized the FRBNY [to extend the loan].  The FRBNY, in turn, approved the loan."  *Id.* at 334.  The plaintiff in that case objected to applying the consultant corollary because the FRBNY had an independent duty to make its own determination to approve the loan authorized by the Board, *id.* at 337, but the Court held that the communications were protected because the agency and non-agency "work[ed] together" and "[t]he key to the success of the Reserve System is harmonious interaction between and among its component parts."  *Id.* at 337.

Plaintiff also asserts that "what matters is the decisionmaker at the end of the deliberative process."  Pl's Mem. at 7.  But Defendants are not aware of authority holding that that is dispositive, and Plaintiff identifies none.  *See id.*  To the contrary, in *McKinley*, the non-agency's

decision appears to have come after the agency's decision, as discussed above.  *See supra* at 5.

Likewise, the ultimate decisionmaker at the end of the deliberative processes at issue in *Am.*

*Oversight v. U.S. Dep't of the Treasury*, 474 F. Supp. 3d 251, 265 (D.D.C. 2020) and *Am.*

*Oversight v. U.S. Dep't of Health & Human Services,* 2022 WL 1719001 (D.D.C. May 27, 2022)

would have been Congress, since those cases concerned proposed legislation.  Yet, in both cases,

the Court held that the consultant corollary applied to protect communications between the

Executive and Legislative branches.[2]  And, among the records protected as intra-agency in

*Judicial Watch v State* were materials generated to prepare nominees for their confirmation

hearings, including emails concerning draft talking points and draft responses to questions from a

member of Congress for a non-agency—a nominee for federal office—who would have been the

ultimate decisionmaker as to the contents of his or her own statements.  *See Judicial Watch, Inc.*,

306 F. Supp. 3d at 103.

Just as in the cases described above, both agency and non-agency decision-making

processes are implicated in the withheld materials here.  Although the Governor would have

been the ultimate decisionmaker as to the contents of her statements, General Marlette's

participation in those discussions included his deliberations about the content of those statements

as a Federal official, informed by Federal rules, regulations, and policies.  *See* Decl. of Gen.

Marlette, ¶ 7.  Likewise, as to the discussion into which he was included about inquiries

regarding issues related to the proper procedure for accepting a private donation by the State of

---

[2] These cases are importantly different from *Dow Jones & Co., Inc. v. Dep't of Justice*, the decision that Plaintiff cites as holding "records created to aid Congress's decision-making [were] not protected."  Pl.'s Mem. at 7 (discussing *Dow Jones & Co., Inc. v. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990)).  While in *Dow Jones*, the Court found that the agency's decisionmaking process had been completed "*before*" the record at issue was shared with Congress, *Dow Jones*, 917 F.2d at 575 (emphasis the Court's), the cases discussed above addressed situations in which agency and Congressional deliberations continued in tandem.

South Dakota, proper routing of such inquiries and which office(s) would be responsible for follow up. *Id.* ¶¶ 7, 15. As General Marlette explained, his participation in those deliberations is critical to his oversight role, which includes oversight of the use of the South Dakota Army National Guard for State Active Duty missions and reimbursement by the State for State Active Duty costs involving the use of Federal equipment, including ensuring compliance with the applicable Federal laws, regulations and procedures. *See id.* Thus, both categories of records reflect both State and Federal decisionmaking.

**B. The Relationship Between the State of South Dakota and the South Dakota National Guard Brings the Records at Issue Within the Consultant Corollary.**

Plaintiff next objects that State officials requested the South Dakota National Guard's input in the records at issue—instead of South Dakota National Guard officials reaching out to the State—and argues that D.C. Circuit precedent "states unequivocally that agency solicitation is required." Pl's Mem. at 8. Plaintiff is mistaken.

As this Court recently explained, records qualify as "intra-agency" under the consultant corollary if "the agency solicited the records from the non-agency *or* there exists 'some indicia of a consultant relationship between the outsider and the agency.'" *National Wildlife Fed'n*, 596 F. Supp. 3d at 141 (quoting *NIMJ*, 512 F.3d at 686 –87) (emphasis added); *Am. Oversight v. U.S. Dep't of the Treasury*, 474 F. Supp. 3d at 263 (same) (quoting *Judicial Watch, Inc.*, 306 F. Supp. 3d at 106–107); *see also Judicial Watch*, 306 F. Supp. 3d at 107 ("Most centrally, the Circuit has highlighted that 'what matters is the nature of the relationship between the consultant and the agency, not the formalities observed.'") (quoting *NIMJ*, 512 F.3d at 687).

Thus, although some cases refer to a requirement for "agency solicitation" as Plaintiff notes, Pl.'s Mem. at 8, that requirement is satisfied not only "when an agency has formally requested advice from a discrete group of experts" but also in a variety of other settings in which

the agency has not actually solicited an outsider's input. *Judicial Watch, Inc.*, 306 F. Supp. 3d at

111 (noting "the D.C. Circuit intimated that the 'solicited' requirement is met when there is

'some indicia of a consultant relationship between the outsider and the agency'") (quoting *NIMJ*,

512 F.3d at 686).  Some courts have therefore observed that "the [D.C.] Circuit does not mandate

agency solicitation for a communication to be 'intra-agency.'" *Am. Oversight*, 474 F. Supp. 3d

at 264 (quotation omitted); *see also Judicial Watch, Inc.*, 950 F. Supp. 2d at 218 n. 3 (finding "no

basis for concluding . . . that agency solicitation is a *necessary* element for 'intra-agency'

classification") (emphasis in original).  But whether the standard is described a "solicitation

requirement" sufficiently broad to encompass situations in which no actual solicitation occurred,

or whether the Court recognizes simply that solicitation is not required, the upshot under the

controlling case law is the same:  the consultant corollary embraces settings like the situation

here, where communications are exchanged during a consultant relationship, irrespective of

whether agency personnel or the outside party happen to have sent the first email.  *See*, *e.g.*,

*Public Citizen, Inc.*, 111 F.3d at 170–172 (holding that "the consultative relationship . . .

mandated by statute" between a former President and the National Archives and Records

Administration (NARA) rendered communications between two former Presidents'

representatives and NARA "intra-agency" records under the consultant corollary without any

discussion or analysis of who initiated the communications).[3]

---

[3] The Supreme Court in *Klamath* noted that *Public Citizen* and another D.C. Circuit case "arguably extend[ed] beyond what [the Court had] characterized as typical examples" of the consultant corollary.  *See Klamath*, 532 U.S. at 12 n.4.  However, the Court did not express a view as to whether *Public Citizen* was correctly decided, and *Public Citizen* remains circuit precedent.  Thus, the D.C. Circuit has subsequently relied on *Public Citizen* in describing the consultant corollary doctrine.  *See NIMJ*, 512 F.3d at 681; *id.* at 685 (declining to separately take up the question of whether *Public Citizen* "*may* have extended Exemption 5 beyond its permissible scope based on [its] peculiar facts") (emphasis the Court's).

For example, in *Am. Oversight v. U.S. Dep't of the Treasury*, another Judge of this Court

held that, under the consultant corollary, communications between the Department of the

Treasury and Congress or Congressional staff concerning tax reform were intra-agency

memoranda.  *See Am. Oversight*, 474 F. Supp. 3d at 262–265.  The Court so held although

Treasury "[had] not provided evidence that the withheld material was generated in response to

Treasury's solicitation of assistance and expert input from Congress or that Treasury manifested

to Congress an intent to engage Congress (or any member, committee, or staff thereof) as a

consultant."  *Id.* at 264 (internal quotation and alterations omitted).  Indeed, the consultancy

relationship in that case "frequently consisted of Congress soliciting Treasury's analysis, data, or

other assistance for its own, congressional purpose."  *Id.* at 265.  Nonetheless, these

circumstances "[did] not change the underlying fact that Treasury had established a consultant

relationship" with the Congressional actors in aid of its deliberative process, and that "there was

an expectation that communications between Treasury and Congress would be kept confidential

to enable candid and thoughtful discussions about policy options."  *Id.* at 264 (internal quotation

and alterations omitted).

Similarly, in *Judicial Watch, Inc. v. U.S. Dep't of State*, the Court held that documents

exchanged between the State Department and The William J. Clinton Foundation, generated in

the course of preparing *prospective* State Department officials, including Hillary Clinton, for

their Senate confirmation hearings, qualified as "intra-agency" under the consultant corollary.

*Judicial Watch, Inc.*, 306 F. Supp. 3d at 110–114.  The plaintiff in that case argued that

"Clinton's emails to State—and communications sent by her staff—might show that she asked

State for assistance in juggling potential conflicts of interest, but her emails do not show that

*State consulted her* on any agency decision."  *Id.* at 110 (quoting plaintiff's brief) (emphasis in

original).   The Court rejected that argument, forgoing analysis of the details of who contacted

whom first; instead, the Court focused on the relationship, concluding that "the Court does not

doubt and finds reasonable State's claims that an agency and a nominee to a high-level agency

position must and will engage in communications to align their messages discuss logistics, and

prepare the agency for new leadership." *Id.* at 111.  The Court held that those circumstances

were "suffic[ient] to trigger a consultant relationship under the consultant corollary," and thus

held that "all of the disputed records qualify as solicited." *Id.*

The same analysis applies in this case.  Irrespective of how the email exchanges at issue

began, they are an integral part of the consultative relationship between the State officials and the

South Dakota National Guard, and General Marlette's ability to make well-informed decisions as

part of his oversight of the South Dakota National Guard.  Decl. of General Marlette, ¶ 19.

Inherent in the South Dakota National Guard's status as a "hybrid State-Federal organization" is

the ongoing necessity for deliberations and oversight from both a Federal and State perspective.

Decl. of General Marlette, ¶ 3 ("Thus, in the course of my leadership of the SDNG, I must

consider both Federal and State rules, regulations, and policies.").

Whether this is described as indicia of a consultative relationship or a relationship

tantamount to solicitation, this circumstance amply satisfies the consultant corollary's

requirements.[4]

---

[4] It makes sense that a Court would treat such a relationship as adequate to satisfy any
requirement for solicitation; if General Marlette ordinarily requires such information to perform
his duties, then it makes sense that the case law would treat this as an effective standing request
or solicitation that such information be provided to him by State officials.

**C. This Case Does Not Implicate the Kind of Adverse Interests that Could Render the Consultant Corollary Inapplicable.**

Finally, Plaintiff urges that the communications at issue should not be treated as "intra-agency records" because the State officials "are not the type of neutral consultants to which the [consultant] corollary applies." Pl's Mem. at 9. But while the State officials involved in these communications are not the "typical" consultants that the Supreme Court discussed in *Klamath*, nor are they burdened with the kinds of conflicts that have prevented the courts from protecting records as "intra-agency."

The Supreme Court in *Klamath* was unequivocal in identifying the basis for its decision; the Court reiterated: "again, the dispositive point is that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors." 532 U.S. at 14. Rather than holding, as Plaintiff asserts, that "the consultant corollary would not have applied 'even if there were no rival interests at stake,'" Pl.'s Mem. at 12 (quoting *Klamath*, 532 U.S. at 14), the Supreme Court expressly declined to reach the question of whether the consultant corollary doctrine properly protected records in which the non-agency consultants had "their own, independent interests." *Klamath*, 532 U.S. at 12 n.4.

Plaintiff acknowledges that two D.C. Circuit cases "suggest that an independent interest on the part of the consultant is not disqualifying." Pl.'s Mem. at 10 n.4 (citing *Public Citizen*, 111 F.3d at 168; *and Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980)). Plaintiff asks this Court to find that *Klamath* superseded these cases if the Court deems it necessary to reach this issue. *Id.* But *Klamath* expressly declined to address whether these cases were correct applications of the consult corollary. *Klamath*, 532 U.S. at 12 n.4. As a result, as noted above, those cases remain binding precedent. *See NIMJ*, 512 F.3d at 681 ("We are, of course, bound to

follow circuit precedent absent contrary authority from an en banc court or the Supreme Court.")
(quotation and alteration omitted).

Accordingly, multiple Judges of this Court have recognized the limited scope of the

holding in *Klamath*, and held that the consultant corollary protected communications between an

agency and a consultant that had independent interests.  For example, in *Judicial Watch, Inc. v.*

*U.S. Dep't of State*, the Court held that communications between an agency and nominee for a

high level agency position fell under the consultant corollary, reasoning that "[a] nominee for a

high-level agency position is not an interested party seeking a government benefit at the expense

of others." *Judicial Watch*, 306 F. Supp. 3d at 113–114; *see also Judicial Watch*, 950 F. Supp 2d

at 218 ("Our circuit has allowed any communication that aids the agency's deliberative process

to be protected as 'intra-agency.' . . . *Klamath* only modifies this by requiring that we not protect

communications with interested parties seeking a government benefit that is adverse to others

seeking that benefit.").

In *American Oversight v. U.S. Dep't of the Treasury*, the Court rejected arguments

similar to those that Plaintiff advances here, and held that communications between Treasury and

Congress were protected under the consultant corollary notwithstanding the plaintiff's objection

that "the congressional participants advanced their own interests and agendas." *Am. Oversight*,

474 F. Supp. 3d at 267 (quoting plaintiff's submission).  The Court held that "the kind of 'self-

interest' that the plaintiff attribute[d] to the congressional actors [in that case] differs from the

disqualifying self-interest at issue in *Klamath*." *Id.* (noting plaintiff was referring to political

differences and "the likely effects on a congressperson's re-election or future career").  The

Court reasoned that, "[a]lthough these congressional individuals may have also had their own

interests that differed somewhat from Treasury's," they "were not seeking a limited benefit from

Treasury to the exclusion of others." *Id.*  Indeed, the Court observed:  "the Circuit has

recognized that back and forth communications between the agency and an outsider can fall

within the consultant corollary doctrine, even when the outsider has interests and goals that differ

from those of the agency." *Id.* at 265 (citing *Public Citizen*, 111 F.3d at 171).

The cases on which Plaintiff relies are not to the contrary.  They comprise either settings

in which the cited language amounts to dicta, or the facts are so different as to render the cases

inapposite.  For example, in *People For The Am. Way Found. v. U.S. Dep't of Educ.*, 516 F.

Supp. 2d 28 (D.D.C 2007), *see* Pl.'s Mem. at 10 (citing same), the Court "note[d] that the D.C.

Mayor's Office advocate[d] the interests of its constituents over the five-year duration of the

D.C. school voucher program with an exclusionary stake in said program." *Id.* at 38.  In other

words, that case involved the kind of zero-sum competition for benefits that *Klamath* expressly

addressed.  And in *Am. Oversight v. HHS*, 380 F. Supp. 3d 45 (D.D.C. 2019), *see* Pl.'s Mem. at 9

(citing same), the Court "ultimately 'put aside the narrow legal question of whether the mere

existence of some independent interest in the topic on the part of the outsider is disqualifying,'"

and found another factor dispositive.  *Am. Oversight*, 474 F Supp. 3d at 268 (quoting *Am.

Oversight v. HHS*, 380 F. Supp. 3d at 54).[5]

Plaintiff objects that the South Dakota National Guard has not made a showing that State

officials were not acting in their own self-interest in the communications at issue.  But it is

_____

[5] *See also Am. Oversight v. HHS*, 2022 WL 1719001, *13 (D.D.C. May 27, 2022)
(describing the discussion in *Am. Oversight v. HHS*, 380 F. Supp. 3d at 54 of the question of
independent interests as:  "unauthoritative dictum—unnecessary to its holding and nonbinding
on this court") (quotation omitted).  The language from *PEER* on which Plaintiff relies, *see* Pl.'s
Mem. at 10 (quoting *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water
Comm'n, U.S.-Mexico*, 740 F.3d 201–202 (D.C. Cir. 2014)), likewise constitutes unauthoritative
dicta, because the D.C. Circuit in that case ultimately declined to reach the question of whether
the consultant corollary applied to the records at issue there.  *See PEER*, 740 F.3d at 202 n.3.

evident from the context explained in General Marlette's declaration that there was no competition over limited resources or benefits in this case; rather, the context of the communications was deliberations regarding statements to the press and the internal procedures that should be followed with respect to a private donation to the State.  As to the former category, General Marlette's participation in the process focused on the quality of information reported out to the public concerning the South Dakota National Guard.  Decl. of General Marlette, ¶ 10.  As to the latter, his participation was part of his oversight role which involved ensuring compliance with the applicable Federal laws, regulations, and procedures.  *Id.*, ¶ 17.  As to these deliberative processes, there was no difference between the State's and the agency's interests, and Plaintiff does not claim that there was.  *See* Pl.'s Mem., *generally*.

That the statements to the press included a reflection of certain policy differences between the Governor and the President reflects a difference akin to that identified in *American Oversight v. U.S. Dep't of the Treasury*, in which the Court rejected an objection that Congressional participants were advancing what the plaintiff in that case referred to as "their own interests and agendas."  *Am. Oversight*, 474 F. Supp. 3d at 267 (quoting plaintiff's submission).  The Court determined that such differences were not those that would disqualify the communications from protection as intra-agency records under *Klamath* because the Congressional participants "were not seeking a limited benefit from [the Federal government] to the exclusion of others."  *Id.*  The same is true here.  There is, therefore, no disqualifying adverse interest in this case.

## III.    CONCLUSION

For all of these reasons and for the reasons explained in Defendants' motion, the Court should grant Defendants' motion for summary judgment and deny Plaintiff's cross-motion.

Dated: April 13, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director,
Federal Programs Branch

*/s/ Julia A. Heiman*
Julia A. Heiman (D.C. Bar No. 986228)
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 616-8480
Julia.Heiman@usdoj.gov
*Counsel for Defendants*